UNITED STATES of America,
Plaintiff,

v.

Jesus AGUERO, et. al., Defendants.

No. 01–0208–CR–GOLD/DUBE.

United States District Court,
S.D. Florida.
Miami Division.

Jan. 23, 2003.

AUSA Allan B. Kaiser & AUSA Curtis Miner (For the Government), Miami, FL, for Plaintiffs.

Roy Kahn, Esquire for Jose Acuna, Miami, FL, Manuel Casabielle, Esquire for R. Fuentes, Miami, FL, Richard Sharpstein, Esquire and Janice Burton Sharpstein, for Beguiristain and Castello, Miami, FL, Harry Solomon, Esquire for E. Lopez, Miami, FL, William D. Matthewman, Esquire for A. Macias, Seiden Alder Rothman, Boca Raton, FL, Hugo A. Rodriguez, Esquire for Aguero, Miami, FL, John William Thornton, Jr., Esquire for Jorge Garcia, Miami, FL, Jay Moskowitz, Esquire, for Israel Gonzalez, Coconut Grove, FL, Sam J. Rabin, Esquire for Jose Quintero, Miami, FL, Albert Levin, Esquire for Oscar Ronda, Miami, FL, for Defendants.

## ORDER DENYING DEFENDANTS' MOTION TO STAY PROCEEDINGS

GOLD, District Judge.

**THIS MATTER** is before the Court upon defendants' sworn motion to stay proceedings pending procurement of a venire which fairly represents a cross section of this community [DE # 603], filed on January 14, 2003. The Government filed a response on January 16, 2003. Oral argument on this motion was held on January 16, 2003. After considering the parties' memoranda and oral argument, the Court hereby denies defendants' motion for the reasons that follow.

### Background

In preparation for the commencement on January 6, 2003, of the jury selection then trial of this case, the court instructed the Jury Section in the Clerk's office to begin the process of gathering potential jurors to sit on the jury venire. Prior to sending out summonses and the standard jury questionnaires for the Southern District of Florida ("AO 180A"), the court discussed with the parties the need to prepare an additional special questionnaire that would be sent out to the potential jurors. The government and the defendants conferred and prepared a seventeen-page questionnaire that was approved by the Court, which would be mailed to the potential jurors along with the AO 180A. The court informed the parties that all persons who would be qualified to sit on the panel would be called from those individuals who had completed and returned their questionnaires.

Pursuant to the Jury Plan for this District[1] as well as the Jury Selection and Service Act, 28 U.S.C. § 1861 et seq., the jury administrator summoned 1,606 randomly selected potential jurors in October 2002[2] from the master jury wheel.[3] Of the 1,606 summoned, only a portion had responded to the initial mailing, the Court therefore instructed the jury administrator to send a followup letter to individuals who had not yet responded to the summons. This letter was mailed on December 11, 2002. Additional responses came in pursuant to the mailing of this followup letter. In accordance with the Jury Plan and the Jury Selection Act, the jury administrator and her staff excused or postponed the appearance of approximately 694 individuals,[4] leaving 229 jurors who were qualified to sit on the panel beginning January 6, 2003.[5] All other individuals unaccounted for represented mailings that were undeliverable or persons who failed to respond to the summons or followup letter. Any other questionnaires that were received from qualified jurors after December 30, 2002, were placed on standby in the event that the 229 qualified potential jurors proved insufficient to impanel a jury.[6]

## Analysis

### I. Parties' Arguments

Defendants have moved to stay the proceedings pending procurement of a venire which fairly represents a cross section of this community pursuant to 28 U.S.C. § 1867 and the Sixth Amendment. Defendants argue that the jury panel for this case was wrongly limited to persons who responded to the special questionnaires prepared by both the government and the defendants. This limitation, assert the defendants, resulted in a panel that was no longer randomly selected and did not fairly represent a cross-section of the community of Miami–Dade County.

With regard to randomness, defendants claim that by limiting the jury panel to those individuals who had responded to the questionnaire, people were in effect allowed to "self-select" themselves to be potential jurors and this self-selection eliminated the randomness of the process and therefore violated the Jury Selection Act. Defendants also argue that this self-selection led to a panel that did not represent a fair cross-section of the community because African–Americans were overrepresented by 100% and Hispanic–Americans were underrepresented by approximately 30%.

To support their arguments, defendants refer to a Jury Selection Report[7] received from the jury administrator that reported on racial and ethnic percentages found in the general population for this jury divi-

---

1. Court's composite exhibit five: Plan for the Random Selection of Grand and Petit Juror and Administrative Order, dated August 29, 2002, adopting the Plan.

2. See Court's exhibits three and six: Certificate of starting number for random drawing and qualified wheel balance sheet.

3. Court's exhibits one and two: Certificate certifying master wheel and certificate regarding public drawing.

4. See Court's exhibit seven: Order Matrix of disqualifications, exemptions, excuses, and denials.

5. See Court's exhibit four: Summoning Yield computation Worksheet dated December 30, 2002.

6. Court's exhibit ten contains the list of names of all potential jurors who turned in their questionnaires after the cut-off date and were therefore placed on standby. The questionnaires are also attached to the list. At the oral argument, the Court informed the parties that if they wished, these additional individuals may be called in and added to the current venire, but both the government and the defendants declined to exercise this option.

7. JS—12 Report, Defendants' exhibit c.

sion as well as the racial and ethnic make-up of a panel pulled from the master jury wheel and consequently pre-qualified as potential jurors. The defendants quote the report as stating that in the general population of Miami–Dade County 18.1% are African–American, 59.8% are Hispanic, and 22.1% are white.[8] The defendants then evaluated the 229 questionnaires of qualified potential jurors, which contained a question about the race and ethnicity of the individual. Based on that evaluation and the answers provided, defendants assert that of the 229 individuals on the jury panel for this case, 37% are African–American, 20% are white, and 42% are Hispanic. Defendants further argue that the jury panel of 229 did not represent a fair cross-section of the community and this disparity resulted from the process used in this case by which only jurors who responded to questionnaires would be called in.

The government responds that the jury wheel actually contains 51.98% Hispanic, which is the relevant percentage to consider in a fair cross-section analysis; the 59.8% quoted by the defendants represent the total percentage of Hispanic's in this division based on the Census Bureau report, which includes citizens and non-citizens, as well as others ineligible for jury service. Citing various case law, the government argues that according to the Jury Selection Act, the jury pool must be pulled from a list of registered voters that represents a fair cross-section of the community, but the panel or the jury that results from such a pulling does not have to reflect a cross-section of the community.

The government further claims that questioning only individuals who responded to the questionnaires did not allow for improper self-selection because the Act, as interpreted by the Seventh Circuit in *United States v. Gometz*, 730 F.2d 475 (7th Cir.1984), contemplated such a result and allowed for discretion on whether to call in persons who failed to respond because Congress recognized that some people lacked a sense of civic obligation and therefore only required "no shows" to be called in when the number of them "was so great that the qualified wheel could not be filled up." In this case, argues the government, because a sufficient amount of individuals responded to the summons to create a jury panel, the "no shows" did not have to be called in.

The government additionally argues that defendants have failed to show that any disparity occurred because of a systematic exclusion of Hispanics from the jury wheel. The government notes that the defendants have not challenged the composition of the master jury wheel as comprising an unfair cross-section of the community, but have challenged the body of people who chose to return questionnaires in this case. The Government contends that this challenge by the defendants is unfounded because a Sixth Amendment challenge must be based on the master jury wheel from which the panel was chosen, not the individual members who returned their questionnaires.

## II. Applying the Law to the Facts

### A. 28 U.S.C. § 1867

According to the Jury Selection and Service Act, 28 U.S.C. § 1861, "It is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross

---

**8.** Based on a review of the report by the Court, it has determined that this figure was wrongly cited by the defendants. The actual percentage for whites in the general population according to the report is 72.3%. In citing the report, defendants failed to account for the difference between ethnicity and race, which were delineated as two separate categories on the report.

section of the community in the district or division wherein the court convenes." Further, 28 U.S.C. § 1862 states that "No citizen shall be excluded from service as a grand or petit juror in the district courts of the United States or in the Court of International Trade on account of race, color, religion, sex, national origin, or economic status." Section 1867 of this statute authorizes a defendant to move for a stay of proceedings if there has been a "substantial failure to comply with the provisions of this title in selecting the grand or petit jury."

As noted above, the district court must "substantially" fail to comply with the Jury Selection Act in order for relief to be granted. *See United States v. Paradies*, 98 F.3d 1266, 1279 (11th Cir.1996) (noting that the "violation is substantial only if it frustrates the Act's two basic goals: (1) random selection of juror names; and (2) use of objective criteria for determination of disqualifications, excuses, exemptions, and exclusions."). The Jury Selection Act also states that "Any person who fails to return a completed juror qualification form as instructed *may* be summoned by the clerk or jury commission forthwith to appear before the clerk or jury commission to fill out a juror qualification form." 28 U.S.C. § 1864(a) (emphasis added).

*1. Substantial Violation*

■■■ In order for the defendants to be granted relief based on a violation of the Jury Selection Act, the violation must be "substantial" because potential jurors on a panel were not randomly selected and the jury administrators failed to use objective criteria to disqualify, excuse, exempt, or exclude potential jurors. *See Paradies su-*

*pra.* At the oral argument, the Court called the jury administrator in charge of this case to go through, step-by-step, the process by which jurors were qualified to sit on the venire.[9] The jury administrator testified in detail about the process of selecting and eliminating potential jurors and how it was done in this case in accordance with the Jury Plan as well as the Jury Selection Act to ensure randomness. After the jury administrator completed her testimony, defendants expressed clearly to the court that they were not challenging the system by which the jury venire was selected from the master wheel. In fact, defendants asserted that they did not challenge how the 1,606 individuals were chosen from the master wheel.[10] Their challenge stemmed specifically from the Court's decision to only place on the venire those potential jurors who had filled out the special questionnaires.

By affirming that they did not allege that the process of selecting the venire for this case was flawed, defendants have confirmed that there has not been a substantial violation of the Act. The 'violation' that they allege has occurred is the departure from randomness. But as outlined in detail above, the Jury Selection Act does not require that all jurors summoned be called in to sit on a jury panel. In fact, the Act states that additional jurors "may" be summoned if sufficient jurors have not reported for duty. As the Court has already explained, with 229 jurors qualified for the panel, and an additional 30 on standby,[11] no need for the Court to exercise its discretion to call in the additional jurors was present. Additionally, as explained in more detail below, the 229 jurors that were

---

**9.** *See* Transcript of Jury Trial Proceedings, *United States v. Acuna*, et al., 01–0208–CR–GOLD, January 16, 2003.

**10.** *See id.* at 37 ("We are not questioning the manner in which the wheel was construct-

ed.... There was not a problem with the initial jury wheel and I didn't allege one.")

**11.** Corrected from the "24" referenced at oral argument.

on the panel represented a fair cross-section of the community, thus supporting the Court's decision that no additional jurors needed to be summoned.

Addressing the randomness argument and the concerns of self-selection directly, the Seventh Circuit in *Gometz* discussed in detail the goals of the Jury Selection Act and the fact that Congress considered the inevitability that not all individuals summoned would respond to a call for service. *See Gometz*, 730 F.2d at 480. The *Gometz* court explained that the Jury Selection Act did not impose a duty on the Court or jury administrators to followup with members of the community who did not respond to a summons if enough responses had been received to generate a venire. *See id.* The Court also discussed in detail Congress's consideration of giving the court discretion on deciding whether to call in "no-shows." *Id.* (noting that "Congress, rather than disapproving the element of nonrandomness implicit in any form of self-screening, wanted people who lacked a sense of civic obligation *not* to serve on federal juries, unless the number of "no shows" was so great that the qualified jury wheel could not be filled up. In that event, but only in that event, the clerks could be expected to use the coercive powers that the Act gave them.") The Seventh Circuit also noted: "If the voter lists are used and supplemented where necessary, and if the procedures outlined in the bill are otherwise vigorously followed, it is no departure from the standards of the legislation that the qualified wheel, the venire or array, or the jury itself, may not reflect a community cross section. The act ... does not require that at any stage beyond the initial source list the selection process shall produce groups that accurately mirror community makeup." *Id.* at 479. No evidence has been presented and no allegation has been made that the court committed a substantial violation of the Jury Selection Act, accordingly defendants

motion based on 28 U.S.C. § 1867 is without merit.

## B. Sixth Amendment

 If there is a constitutional challenge to the jury selection process, movants must establish a prima facie case that the jury selection procedures followed did not produce a fair cross-section of the community. *See U.S. v. Grisham*, 63 F.3d 1074, 1078 (11th Cir.1995). To establish a prima facie case, a defendant must show "(1) that the group alleged to be excluded is a distinctive group in the community, (2) that representation of the group in venires is not fair and reasonable in relation to the number of persons in the community, and (3) that the underrepresentation is due to a systematic exclusion of the group in the jury-selection process." *Id.* (citing *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979)).

 The Eleventh Circuit has noted that "[a]ssessing the fairness and reasonableness of a group's representation requires a comparison between the percentage of the 'distinctive group' on the *qualified jury wheel* and the percentage of the group among the population *eligible for jury service* in the division." *United States v. Rodriguez*, 776 F.2d 1509, 1511 (11th Cir.1985) (citing *United States v. Pepe*, 747 F.2d 632, 649 (11th Cir.1984)) (emphasis added). In addition, as long as there is no allegation of racial gerrymandering, "selecting juries at random from a predetermined geographical area provides a sufficiently diverse jury pool to ensure impartiality." *Grisham*, 63 F.3d at 1080.

### 1. Element One: Distinctive Group

 It is not in dispute that Hispanics are a distinctive group in the community. *See United States v. Weaver*, 267 F.3d 231, 240 (3rd Cir.2001).

## 2. Element Two: Fair cross-section

In order for defendants to prove that a fair cross-section is not represented by the venire, there has to be a disparity in percentage of more than 10%. *See Grisham,* 63 F.3d at 1079. In this case, defendants have claimed that the venire consists of 42% Hispanics, while the community contains 59.8% Hispanics. This would result in a disparity of over 10% and therefore meeting element two of the prima facie case. To support this position defendants attached to their motion the JS–12 report previously discussed.

As explained by the jury administrator during her testimony, the JS–12 report is prepared pursuant to 28 U.S.C. § 1863(a) to ensure that the master jury wheel from which potential jurors are pulled represents a fair cross-section of the community.[12] The JS–12 provides a breakdown by race, ethnicity, and gender of Miami–Dade County.

The Court has carefully reviewed the JS–12 report as well as considered the testimony of the jury administrator and has determined that the 59.8% quotation by the defendants is of the Census Bureau's head-count of the general population of Miami–Dade County. Thus, this percentage includes non-citizens, children, and others who are otherwise ineligible for jury service. The jury administrators, in order to prepare the report, surveyed the first panel drawn from the master wheel restocked in 2001, using 1,604 names. Of the individuals who returned the official jury questionnaires, 51.8% were Hispanic and of those individuals 49.76% were qualified for jury service. The Eleventh Circuit has held that in assessing disparity for fair cross-section purposes, the applicable comparison is between the percentage of individuals on the jury wheel and the percentage of members of the population eligible for jury service. *See Grisham,* 63 F.3d at 1078. Applying *Grisham*'s rationale to the present case, and reviewing the composition of the jury venire of 229 people, a more than 10% disparity does not exist because the correct comparison is between 42% and 49.76%. *See also, Rodriguez,* 776 F.2d at 1511 (noting that "although precise mathematical standards are not possible, this circuit has consistently found that a prima facie case of underrepresentation has not been made where the absolute disparity between these percentages does not exceed ten percent.") (citing *United States v. Tuttle,* 729 F.2d 1325, 1327 (11th Cir.1984); *United States v. Butler,* 611 F.2d 1066, 1069–70 (5th Cir.1980); and *United States v. Maskeny,* 609 F.2d 183, 190 (5th Cir.1980)). Consequently, because any disparity here is approximately 7%, defendants' argument fails to establish the second element of a Sixth Amendment prima facie case for fair cross-section violation.

## '3. Element Three: Systematic Exclusion

Even if the Court were to accept defendants' percentages, which it has already shown was based on an inaccurate analysis of the JS–12 report, defendants' motion would still fail because defendants have inadequately alleged element three of the prima facie case. As noted earlier, defendants must show that any disparity that exists is due to a "systematic exclusion" of the distinctive group, here Hispanics, from the jury pool. In this case, defendants have only alleged that the disparity is due to the system used by this Court of declining to summon the individuals who did not respond to the jury questionnaires, alleging that the system became "skewed." Such an allegation is insufficient to satisfy element three as no

---

**12.** See Court's Exhibits eight and nine.

systematic exclusion has been demonstrated.

Defendants have already admitted that they do not challenge the integrity of the system used to select potential jurors from the jury wheel. The Court has submitted to the record documents that confirm that the jury selection procedures were properly followed by the jury administrators. Defendants have not shown that Hispanics have been "systematically" excluded from serving as jurors because of the system in place for selecting jurors or even because of the system used in this case of using special questionnaires. In accordance with the law, defendants have also not shown that anything about the process used systematically excluded individuals based on their race, ethnicity, or gender. In fact, defendants have not challenged the exclusions of individuals from service in this case and have not shown that any method used was anything other than neutral.

The Eleventh Circuit has noted that "defendants are not entitled to a jury of any particular composition, but the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinct groups in the community and thus fail to be reasonably representative." *United States v. Green*, 742 F.2d 609, 611 (11th Cir.1984) (citing *Taylor v. Louisiana*, 419 U.S. 522, 538, 95 S.Ct. 692, 701, 42 L.Ed.2d 690 (1975)). The First Circuit has also noted in a case challenging the constitutionally of a jury because it allegedly did not contain a representative number of Hispanics, that in addressing systematic exclusion, the defendant identified "neither a systemic defect nor an operational deficiency in the Jury Plan which would account for the alleged underrepresenation ... and he ex-

pressly disavows any suggestion that the Jury Plan was either designed or intended to exclude Hispanics." *United States v. Pion*, 25 F.3d 18, 23 (1st Cir.1994). The *Pion* court also explained that because the names from the master wheel were randomly drawn from inclusive data, there could be no reasonable inference that there was a systematic exclusion of Hispanics at any stage, including at the distribution of juror questionnaires. *See id.* Similarly in this case, defendants have not pointed to any deficiency in the Jury Plan or even in the process by which the names of the 1,606 potential jurors were pulled from the jury wheel.

In *Gibson v. Zant*, 705 F.2d 1543, 1545 (11th Cir.1983), which held that the jury in that case had been drawn from a venire that unconstitutionally excluded women and Blacks, the Eleventh Circuit noted that the selection procedures were not racially or sexually neutral and were susceptible to abuse. The defendants have not shown that the special questionnaires used in this case, which they prepared with the government, were not racially or ethnically neutral. Nothing else about the process of exclusion was challenged by the defendants. In sum, the defendants have not met the threshold necessary under element three to establish a prima facie case.[13]

### Conclusion

Defendants have not convinced the court that the proceedings should be stayed in order to procure a venire that fairly represents a cross section of this community. They have inadequately shown that any, much less substantial, violation of the Jury Selection Act occurred. In addition, they have failed to meet their burden of establishing two elements of the three-element

---

**13.** The Court additionally notes that defendants suffered no prejudice as a result of any alleged exclusion of potential jurors who failed to respond to the special questionnaires because of the resulting venire of 69 individuals who remained from which to create a jury 47.8% were Hispanic. A resulting jury of 66.6% Hispanic was eventually impaneled.

test needed to prove a prima facie case of unfair cross-section of the community. Accordingly, it is hereby:

**ORDERED AND ADJUDGED THAT:**

1. Defendants' Sworn Motion To Stay Proceedings Pending Procurement of a Venire Which Fairly Represents a Cross Section of this Community [DE # 603] is **DENIED**.